**CASE NOS. 25-7038 and 25-7039**

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| AMBER STEPP, *et al*., | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 25-7038 |
| | ) | (D.C. No. 6:24-CV-00146-JAR) |
| JASON LOCKHART, *et al.,* | ) | (E.D. Okla.) |
| | ) | |
| Defendant-Appellant. | ) | |

| | | |
|---|---|---|
| AMBER STEPP, *et al*., | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 25-7039 |
| | ) | (D.C. No. 6:24-CV-00146-JAR) |
| KEVIN MCCLAIN, *et al.,* | ) | (E.D. Okla.) |
| | ) | |
| Defendant-Appellant. | ) | |

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

# APPELLEE'S BRIEF

J. Blake Johnson, OBA No. 32433
Kelsey Frobisher Schremmer, OBA No. 35841
OVERMAN LEGAL GROUP, PLLC
809 NW 36th Street
Oklahoma City, Oklahoma 73118
Telephone: (405) 605-6718
blakejohnson@overmanlegal.com
kelseyschremmer@overmanlegal.com

Wyatt McGuire, OBA No. 34720
MCGUIRE LAW FIRM
200 E. 10th Street Plaza
Edmond, Oklahoma 73034
Telephone: (405) 513-5658
wyatt@kentmcguirelaw.com

# ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................2

TABLE OF AUTHORITIES .........................................................................4

STATEMENT OF RELATED APPEALS .................................................9

GLOSSARY..................................................................................................9

INTRODUCTION .......................................................................................10

SUMMARY OF THE ARGUMENT .......................................................10

ARGUMENT ...............................................................................................12

I.    **Appeal 25-7038 (TPSD Officials)**.................................................**13**

    A.  Each of the TPSD Officials individually participated in the alleged violations..............................................................................................13

        1.  *Types of Participation*...........................................................14

        2.  *Facts Alleged* ..........................................................................16

    B.  The District Court correctly found that Lockhart, Anderson, and the Board Members each participated in the violation of Plaintiffs' clearly established Equal Protection Rights. ...........................................26

        1.  *Violative Conduct*..................................................................26

        2.  *Clearly Established Law* .......................................................30

    C.  The District Court correctly found that Lockhart, Anderson, and the Board Members each participated in the violation of Plaintiffs' clearly established Procedural Due Process Rights. ...............................32

        1.  *Violative Conduct*..................................................................32

        2.  *Clearly Established Law* .......................................................35

D.  The District Court properly determined that the TPSD Officials' First Amendment retaliation would chill persons of ordinary firmness.............41

E.  TPSD Officials are not immune from suit on the foregoing violations, and they are not immune from their conspiracy to commit said violations. ....46

**II.  APPEAL 25-7039 (TEACHER KEVIN MCCLAIN) .........................................48**

A.  McClain personally participated in the deprivation of Plaintiffs' Equal Protection and Substantive Due Process Rights. ........................................48

B.  The District Court correctly found that McClain directly violated Plaintiffs' clearly established rights to Equal Protection under the law.....................50

1.  *Violative Conduct*..................................................................................50

2.  *Clearly Established Law* .......................................................................51

C.  The District Court correctly found that McClain directly violated Plaintiffs' clearly established Substantive Due Process rights. ..................................53

CONCLUSION .......................................................................................................56

STATEMENT REGARDING ORAL ARGUMENT ...........................................56

CERTIFICATE OF COMPLIANCE...................................................................57

CERTIFICATE OF SERVICE ...........................................................................57

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                 *Page(s)*

*Abeyta v. Chama Valley Indep. Sch. Dist., No. 19*,
77 F.3d 1253 (10th Cir. 1996) ...........................................................54–55

*Allah v. Seiverling*,
229 F.3d 220 (3d Cir. 2000)....................................................................45

*A.N. v. Syling*,
928 F.3d 1191 (10th Cir. 2019) ..............................................................30

*Anderson v. Creighton*,
483 U.S. 635 (1987)................................................................................38

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).........................................................................17–18

*Bass v. Robinson*,
167 F.3d 1041 (6th Cir. 1999) ................................................................15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................17, 25

*Bledsoe v. Carreno*,
53 F.4th 589 (10th Cir. 2022) .................................... 15, 17, 24, 39, 47, 55

*Bridges ex rel. D.B. v. Scranton Sch. Dist.*,
644 F. App'x 172 (3d Cir. 2016) .............................................................55

*Brown v. Board of Ed. of Topeka*,
347 U.S. 483 (1954) .....................................................................28, 32, 38

*City of Escondido v. Emmons*,
586 U.S. 38 (2019)..................................................................................39

*Constantine v. Rectors & Visitors George Mason Univ.*,
202 F.3d 676 (4th Cir. 2000) ..................................................................45

*Costello v. Mitchell Pub. Sch. Dist. 79*,
266 F.3d 916 (8th Cir. 2001) ...................................................................55

*Coutoure v. Bd. of Ed. of Albuquerque Pub. Schs.*,
535 F.3d 1243 (10th Cir. 2008) ................................................36, 39, 48

*Dixon v. City of Lawton*,
898 F.2d 1443 (10th Cir. 1990) ..............................................................47

*Dodds v. Richardson*,
614 F.3d 1185 (10th Cir. 2010) ..............................................................15

*Doe v. Detroit Pub. Sch. Comm. Dist.*,
2022 WL 989331 (E.D. Mich. Mar. 31, 2022) .......................................55

*Doe v. Gooden*,
214 F.3d 952 (8th Cir. 2000) ...........................................................40, 55

*Doe v. Hutchinson*,
728 F. App'x 829 (10th Cir. 2018) ...................................................51–53

*Doe v. Miami Univ.*,
882 F.3d 579 (6th Cir. 2018) ..................................................................37

*Doe v. Rocky Mtn. Classical Aca.*,
99 F.4th 1256 (10th Cir. 2024) ...............................................................29

*Doe v. Wood Cnty. Bd. of Ed.*,
888 F. Supp. 2d 771 (S.D.W.Va. 2012)...................................................30

*Escue v. N. Okla. College*,
450 F.3d 1146 (10th Cir. 2006) ........................................................31, 50

*Frasier v. Evans*,
992 F.3d 1003 (10th Cir. 2021) ..............................................................47

*Goss v. Lopez*,
419 U.S. 565 (1975)...............................................................36, 39, 48

*Holland v. Harrington*,
268 F.3d 1179 (10th Cir. 2001) ...............................................................15

*Hope v. Pelzer*,
536 U.S. 730 (2002)...............................................................12, 31, 39, 55

*Irizarry v. Yehia*,
38 F.4th 1282 (10th Cir. 2022) ...............................................................43

*Janny v. Gamez*,
8 F.4th 883 (10th Cir. 2021) ...................................................................47

*Johnson v. City of Shelby*,
574 U.S. 10 (2014)...................................................................................17

*Johnson v. Whitney*,
723 F. App'x 587 (10th Cir. 2018) ..........................................................44

*Koessel v. Sublette Cnty. Sheriff's Dep't.*,
717 F.3d 736 (10th Cir. 2013) .................................................................53

*L.H. v. Pittston Area Sch. Dist.*,
666 F. App'x 213 (3d Cir. 2016) ..............................................................55

*McBeth v. Himes*,
598 F.3d 708 (10th Cir. 2010) .................................................................43

*McCook v. Spriner Sch. Dist.*,
44 F. App'x 896 (10th Cir. 2002) ............................................................45

*Miss. Univ. for Women v. Hogan*,
458 U.S. 718 (1982)...........................................................................29–30, 39

*Muskrat v. Deer Creek Pub. Schs.*,
715 F.3d 775 (10th Cir. 2013) .................................................................54

*Mullenix v. Luna*,
577 U.S. 7 (2015)...............................................................................12, 55

*Redmond v. Crowther*,
882 F.3d 927 (10th Cir. 2018) ................................................................12

*Robbins v. Oklahoma*,
519 F.3d 1242 (10th Cir. 2008) ...............................................14, 16–17

*Rost v. Steamboat Springs RE-2 Sch. Dist*,
511 F.3d 1114 (10th Cir. 2008) ..............................................................50

*Saucier v. Katz*,
533 U.S. 194 (2001)..................................................................................55

*S.E.C. v. Shields*,
744 F.3d 633 (10th Cir. 2014) ................................................................17

*Serna v. Colo. Dep't of Corrs.*,
455 F.3d 1146 (10th Cir. 2006) ..............................................................15

*Sh.A. ex rel J.A. v. Tucumcari Mun. Schs.*,
321 F.3d 1285 (10th Cir.) ......................................................................53

*Shero v. City of Grove*,
510 F.3d 1196 (10th Cir. 2007) ......................................................42–43

*Starrett v. Wadley*,
876 F.2d 808 (10th Cir. 1989) ........................................................31, 50

*Thompson v. Ragland*,
23 F.4th 1252 (10th Cir. 2022) ......................................................12, 39

*Totty v. Indep. Sch. Dist. No. I-009 of Blaine Cnty. Okla.*,
2010 WL 11606954 (W.D. Okla., Apr. 14, 2010)..................................55

*Tonkovich v. Kan. Bd. of Regents*,
159 F.3d 504 (10th Cir. 1998) ........................................................40–41

*United States v. Virginia*,
518 U.S. 515 (1996)..........................................................................29, 31

*Watson v. Beckel*,
242 F.3d 1237 (10th Cir. 2001) ................................................................37

*Wilburn v. Mid-S. Health Dev., Inc.*,
343 F.3d 1274 (10th Cir. 2003) ...............................................................14

*Zinermon v. Burch*,
494 U.S. 113 (1990) .................................................................................35

**FEDERAL STATUTES**

20 U.S.C. § 1681 ......................................................................................31

42 U.S.C. § 1983 ......................................................................................14

**OTHER AUTHORITIES**

34 C.F.R. § 106.34 (2020) .......................................................................31

34 C.F.R. § 106.71(a) (2020) ...................................................................43

70 O.S. § 5-117 ........................................................................................23

Okla. Admin. Code § 210:35-3-48 ..........................................................18

## **STATEMENT OF RELATED APPEALS**

There are no other, related appeals. But this brief is filed in two consolidated appeals: Nos. 25-7038 and 25-7039.

## **GLOSSARY**

| OSDE | Oklahoma State Department of Education |
|------|----------------------------------------|
| TPSD | Talihina Public School District |

## INTRODUCTION

Amber and Jonathon Stepp are Talihina residents and have five children, including J.S. In 2022, when J.S. was only eleven, Amber and Jonathon made the difficult decision to remove him and his siblings from Talihina Elementary. They did so only *after* Appellants applied an unconstitutional policy of sex segregation to J.S.'s fifth grade class, subjecting him to teacher Kevin McClain's verbally and psychologically abusive behavior that targeted J.S. with derogatory, sex-based language (*e.g.*, "queer") during class and in front of his peers. The Stepp Family complained, first informally and then through a written Title IX complaint, mistakenly believing that district administrators and supervisors would intervene to correct the harassing behavior. Instead, they removed J.S. from the classroom, conducted a biased and improper investigation, defamed the Stepp Family in their small community, repeatedly disregarded federal law and regulation, and employed intimidation tactics to drive the family away from the school and school functions. Appellants' acts and omissions caused multiple deprivations of Plaintiffs' clearly established, constitutional rights.

## SUMMARY OF THE ARGUMENT

The District Court correctly found that each individual Appellant personally participated in several violations of Plaintiffs' constitutional rights and that these

rights were clearly established at the time. McClain violated J.S.'s equal protection and substantive due process rights by targeting him with an aggressive campaign of sexual harassment and bullying based on J.S.'s sex and perceived gender performance. The TPSD Officials violated J.S.'s equal protection rights by enacting and enforcing a policy of sex-based segregation and permitting and defending McClain's outrageous misconduct in the classroom. After Plaintiffs lodged formal complaints, TPSD Officials violated Plaintiffs' procedural due process rights by continuing enforcement of the unconstitutional segregation policy, by removing J.S. from the classroom without notice or the opportunity to be heard, and by conspiring to manipulate a sham Title IX investigation aimed at covering their own liability rather than vindicating a student's right to a safe educational environment. The TPSD Officials further violated Plaintiffs' rights by maliciously retaliating against them in response to their complaint.

In each instance, Appellants knew what they were doing and knew that their conduct offended clearly established law. Qualified immunity exists to shield responsible state actors from liability for good-faith conduct. It does not protect flagrant violations of students' civil rights or the refusal of public officials to obey the law. The District Court should be affirmed.

## **ARGUMENT**

Appellants bring this interlocutory appeal on the limited question of whether individual officials are entitled to qualified immunity on Plaintiffs' Section 1983 claims. The District Court's thoughtful, individualized analysis *did* grant several of the Appellants qualified immunity on several claims. Where it has permitted Section 1983 claims to proceed against individual officials, the court did so in recognition, and faithful application, of this well-established rule: qualified immunity is not available where (i) a complaint adequately states a violation of a federally protected right and (ii) that right was clearly established at the time, such that a reasonable, competent state actor would have been on notice that his conduct was improper. *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015).

While legal principles stated at a high level of generality do not necessarily suffice, this Court has repeatedly recognized there "need not be a case precisely on point" in order to give notice to a reasonable officer. *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018). That is particularly true where, as here, the rights asserted are particularly well-established and the violations are particularly obvious. *Thompson v. Ragland*, 23 F.4th 1252, 1255 (10th Cir. 2022); *see also Hope v. Pelzer*, 536 U.S. 730, 745 (2002).

## I. APPEAL 25-7038 (TPSD OFFICIALS)

This brief addresses two consolidated appeals. The first (Appeal No. 25-7038) was filed by several individual school-district Defendants/Appellants:

- Jason Lockhart, who was at all relevant times the superintendent of Talihina Public School District ("TPSD");

- Kathy Anderson, Talihina Elementary's principal;

- Bill Blair and Tracy Bryant, who worked jointly to complete an investigation into Plaintiffs' Title IX complaint and who each interacted with Plaintiffs at school or school-sponsored events following the complaint; and

- Scottie Russell, Steve Woods, Leslie Crank, Rusty Blue, and Courtney Moreland (collectively, the "Board Members"), who joined Lockhart to compose the TPSD Board at all relevant times.

These Appellants are sometimes referred to collectively as the "TPSD Officials."

The second appeal (No. 25-7039) was initiated by Defendant/Appellant Kevin McClain, who was Plaintiff J.S.'s teacher during the relevant period. The claims against McClain are more specifically addressed in Part II, below.

### A. Each of the TPSD Officials individually participated in the alleged violations.

As set forth in the governing Second Amended Complaint (hereinafter "Complaint") (App. Vol. 1 at 27–92) and accurately summarized in the District Court's two Opinions and Orders (App Vol. 2 at 4–33 & 34–84), this litigation arises from the harms experienced by Plaintiff/Appellee J.S. and his parents,

Amber and Jonathon Stepp, at the hands of school officials who used their state-sanctioned powers to involuntarily sex-segregate an elementary school and then bully, harass, and retaliate against the children and families who suffered the predictable adverse consequences. As shown in this Part I, each of the TPSD Officials personally participated in well-pleaded violations of clearly established law. The District Court's findings should be affirmed.

### 1.  *Types of Participation*

The TPSD Officials raise for the first time on appeal the question of whether Plaintiffs' claims satisfy Section 1983's personal participation requirements. *See generally* App. Vol. 1 at 154–201, 286–300 (briefs below).[1] The Court should consider this argument waived. *See Wilburn v. Mid-South Health Dev., Inc.*, 343 F.3d 1274, 1280 (10th Cir. 2003).

Even if Appellants had preserved this issue for review, they ought not prevail on it. "Personal participation" is not nearly so limited as TPSD Officials would have the Court hold. Instead, as courts have repeatedly recognized, a state

---

[1] Appellants did argue below that the fact allegations in the Complaint were insufficient under the *Twombly/Iqbal* standard as this Court has applied it to Section 1983 claims. *See* App. Vol. 1 at 166 (citing *Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008)). Although that argument shares some vocabulary, it is a distinct question under Rule 8, and it is separately addressed in Part I.A.2. *infra*. "Personal participation," as the Court well knows, is instead a substantive element of a Section 1983 claim that gives meaning to the statutory requirement that an officer "cause" a deprivation of federally ensured rights. 42 U.S.C. § 1983. That argument was *not* raised or briefed below, and even in Appellants' opening brief, it is mentioned only in passing. *See* Dkt. 20 at 25, 38, 40.

actor can, within the meaning of Section 1983, cause an offending violation *either* through direct, active participation *or* simple acquiescence. *Serna v. Colo. Dep't of Corrs.*, 455 F.3d 1146, 1152 (10th Cir. 2006) (citing *Holland v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001)). This acquiescence must be actual, as opposed to a "mere right to control employees." *Id.* at 1153 (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). But it can take a variety of forms: an official's exercise of control or discretion, failure to supervise, or even "tacit[] authoriz[ation]" of offending acts are each independently sufficient to satisfy the personal-participation requirement. *Id.* at 1152–53; *cf. Bledsoe v. Carreno*, 53 F.4th 589, 611 (10th Cir. 2022) (citing officer's supervision of "the officers who [were alleged to have] undertake[n] more specific unlawful actions" as supporting a reasonable inference that he directly participated in a conspiracy and failed to intervene). One particularly pertinent example is this Court's recognition that a supervisor may be liable under Section 1983 for his or her conduct in creating, promulgating, or implementing a policy that causes the deprivation of constitutional rights. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

With the exception of McClain—whose direct, active participation in the alleged deprivations cannot reasonably be disputed—each of the individual defendants held a position of general supervision (Superintendent Lockhart, Principal Anderson, all five members of the TPSD Board), specific decision-

making authority (Title IX co-investigators Blair and Bryant), or both. From these positions of power, and with full and actual knowledge of the relevant conduct, these individuals *personally* participated in the deprivation of Plaintiffs' federally protected rights—through what they individually did and what they failed to do. *See* Part I.A.2 *infra*.

### 2. *Facts Alleged*

Despite an extremely thorough Complaint that (to the best of Plaintiffs' pre-discovery ability) identifies relevant names, dates, communications, and motives—and despite the lower court's sound and individualized findings (App. Vol. 2 at 61–65) of each TPSD Official's personal participation—Appellants still argue that the Complaint's use of expressly defined terms (such as "Defendants" and "Board Members") to efficiently state allegations somehow renders it deficient. Dkt. 20 at 24–25. This hyper-technical interpretation of Rule 8 and its pleading standards simply does not align with precedent.

All that is required is that the Complaint provide fair notice of who is alleged to have done what and to whom. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1249–50 (10th Cir. 2008). While this standard requires more from plaintiffs than conclusory claims against vaguely described groups of tangentially related defendants, it in no way requires courts or litigants to ignore well-pleaded "collective allegations," which for economy's sake may refer to individually

identified defendants "as a whole or to certain groups of defendants, rather than identifying specific actions taken by individual[s]." *See Bledsoe*, 53 F.4th at 608. This Court has already rejected Appellants' exact argument, observing that collective allegations should be viewed "in tandem" with a complaint's other allegations and affirming that "use of collective defined terms in certain allegations" does not, on its own, "doom [Plaintiff's] claims." *Id.* In addition, much of the conduct alleged *was* undertaken by groups of TPSD Officials, such as when all Board Members together with the Superintendent acted or failed to act with regard to particular school policy. The specific descriptions of events, dates, and participants found in the Complaint is nothing like the deficient allegations rejected in *Robbins*. *See* 519 F.3d at 1250.[2]

Moreover, the *Twombly* and *Iqbal* pleading standard does not require perfect form, extreme detail, or comprehensive theorizing. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014). Instead, all that is required is a "short and plain statement of the claim" with enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *S.E.C. v. Shields*, 744 F.3d

---

[2] There, plaintiff alleged only that "Defendants," *i.e.*, some unspecified combination of the statewide DHS Director, an owner/operator of a private daycare, social workers from a local DHS office, and several unnamed DHS supervisors, together committed all relevant acts, ranging from controlling the daycare's operations to instructing DHS child placement.

633, 640 (10th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Here, the Complaint describes in *detail* the course of events and individual conduct by which Appellants placed J.S.—an eleven-year-old boy entrusted to their care and entitled to a public education—into a sex-segregated environment where educators verbally abused, sexually harassed, and maliciously retaliated against him while authority figures refused to intervene and conspired to prevent exposure.

***Superintendent Lockhart.*** Lockhart is legally responsible for developing and administering rules, procedures, and policies; evaluating school employees such as McClain and Anderson; and supervising all educational and communications programs. Okla. Admin. Code 210:35-3-48(b); App. Vol. 1 at 29, ¶ 6. In 2022, he and Principal Anderson personally directed Talihina Elementary's policy to segregate its fifth-grade students based on sex. App. Vol. 1 at 31, ¶ 21. He also participated, as a member of the TPSD Board, in approving this sex-segregation policy. App. Vol. 1 at 32, ¶ 23. He personally met with Plaintiff Jonathon Stepp on August 25, 2022, and received Mr. Stepp's detailed report of McClain's discriminatory and harassing in-class treatment. App. Vol. 1 at 34, ¶ 41. Despite this notice, McClain was allowed to continue his verbally and psychologically abusive behavior.

On August 29, 2022, Amber and Jonathon Stepp again met with Lockhart. App. Vol. 1 at 38, ¶ 66. At this meeting, they requested information on how to file

a formal Title IX complaint and how to contact the TPSD Board. Lockhart and the other attendees offered "little to no information" in response. App. Vol. 1 at 38, ¶ 67. In fact, prior to this second meeting, Lockhart had been attempting to coordinate with Principal Anderson and McClain himself on how to deal with the Stepp Family's complaints. App. Vol. 1 at 38, ¶ 65. Lockhart was joined at the August 29 meeting by not only McClain but also Rebecca McLemore, then-Title IX Coordinator. Notably, Lockhart largely prevented Ms. McLemore from speaking during this meeting. App. Vol. 1 at 39, ¶¶ 69–70. It was only through McLemore's independent efforts, after this meeting, that the Stepp Family received a complaint form and instructions on how to submit it. App. Vol. 1 at 39, ¶¶ 71–72.

Following the formal complaint, Lockhart communicated directly with Anderson and Russell about the Stepp Family's allegations, and these communications either were written or resulted in memorializing notes. App. Vol. 1 at 45, ¶ 109. But Lockhart inexplicably "discussed and decided" with Anderson that these notes would be withheld from the Title IX investigation, despite McLemore's repeated requests. App. Vol. 1 at 45–46, ¶¶ 111–13. Thus, Lockhart exercised direct control over materials the investigator was allowed to review, providing her with his "notes and statements alone."[3] App. Vol. 1 at 46, ¶ 113.

---

[3] McLemore eventually resigned her role via note to Lockhart: "I believe to continue in this role would set me in a place of ethical and professional liability." App. Vol. 1 at 46–47, ¶¶ 118–19. She was replaced by more pliant investigators, Blair and Bryant. App. Vol. 1 at 47, ¶ 121.

On September 6, 2022, Lockhart (as a member of the Board) received a public presentation from the Stepp Family and other concerned parents and grandparents of children in McClain's class. In particular, they were confronted with the effects of the ongoing sex-segregation policy, the particulars of McClain's inappropriate behavior toward J.S., and the improper removal of J.S. from his classroom. App. Vol. 1 at 46, ¶ 115. With full knowledge of the precise details of these several ongoing violations of J.S.'s rights—and with full supervisory powers and obligations—Lockhart refused to take corrective action and stubbornly continued to enforce the unconstitutional policies. App. Vol. 1 at 46, ¶¶ 115–17.

***Principal Kathy Anderson.*** Anderson was, at the relevant times, the principal of Talihina Elementary. App. Vol. 1 at 30, ¶ 12. She and Lockhart directed and implemented the aforementioned sex-segregation policy. App. Vol. 1 at 31, ¶ 21. As with Lockhart, she received notice of the Stepp Family's informal complaint in late August 2022, and coordinated with Lockhart, McClain, and others about "how to deal with Plaintiffs' complaint of sexual harassment." App. Vol. 1 at 38, ¶ 65.

Anderson was also directly involved in the improper removal of J.S. from his classroom following the Stepp Family's formal Title IX complaint. *See* App. Vol. 1 at 43–44, ¶¶ 96–100. Specifically, in response to the Stepp Family's several vocalized concerns (that J.S.'s removal was the equivalent of punishing him for

reporting McClain, that the proposal of placing J.S. into the all-girls classroom would further stigmatize and ostracize J.S., and that the ongoing segregation of classes was the problem that left J.S. with no fair education solutions), Anderson responded by setting J.S. on a modified schedule. App. Vol. 1 at 44, ¶ 100. That schedule involved a single period of classroom instruction (for Language Arts), with the remainder of J.S.'s day spent in the library with little ordinary instruction, and without the resources necessary to fulfill his Individualized Education Program (IEP). App. Vol. 1 at 44, ¶¶ 100–02.

Despite acknowledging her several pertinent communications with McClain, Lockhart, and Russell, Anderson withheld evidence of these communications from the Title IX investigation, App. Vol. 1 at 45–46, ¶¶ 108–13, and attempted to redirect McLemore's focus to finding fault with the Stepp Family, App. Vol. 1 at 45, ¶ 110 (raising, unprompted, various issues with the family's other children in ways that the investigator noted as odd and "completely unrelated"). Ultimately, Anderson refused to cooperate with the investigation. App. Vol. 1 at 45–46, ¶ 113.

But once that investigation closed, under Blair and Bryant's leadership, it was Anderson who called Jonathon Stepp, in mid-September, to notify him the investigation was over and no other information would be provided. App. Vol. 1 at 49, ¶ 133. Notably, Anderson failed to mention any right to appeal and instead described the decision as "final" and announced that J.S. was no longer entitled to

a modified schedule and must immediately return to McClain's classroom. App. Vol. 1 at 49, ¶¶ 133–36. This call occurred on or about September 17. App. Vol. 1 at 49, ¶ 133.

On September 29, TPSD received a letter from the Oklahoma State Department of Education (OSDE), advising that the sex-segregation policy violated federal civil rights laws, raising specific concerns about statements "made by District educators indicating that there was in fact an intent to treat Talihina's 5th grade boys and girls differently," and ordering the school to integrate no later than October 10. App. Vol. 1 at 50, ¶¶ 138–41. In response, Anderson sent letters to each fifth-grade student that demonstrated, in several ways, Anderson's contempt for the reintegration mandate and how minimally she intended to comply with it. App. Vol. 1 at 51, ¶¶ 143–44. It was only then—following the school's forced reintegration—that J.S. was able to return to a normal classroom environment.

Unfortunately, Anderson personally ensured that the mistreatment continued. In response to inquiries from parents about the reintegration plan and mid-year classroom moves, Anderson specifically named J.S. and blamed the Stepp Family for the changes, "press[ing] her view that Plaintiffs' allegations against McClain were unsubstantiated and lament[ing] that Plaintiffs had continually pressed OSDE for action." App. Vol. 1 at 52, ¶ 147. This prompted yet

22

another meeting between Jonathon Stepp and Anderson, during which Anderson defended the sex-segregation policy and made several false accusations against the Stepp Family in an apparent attempt to deflect and discourage further complaints. App. Vol. 1 at 52, ¶¶ 148–52.

***Board Members (Russell, Woods, Crank, Blue, Moreland).*** These five individuals, together with Lockhart, constituted the TPSD Board at all relevant times. App. Vol. 1 at 28–29, ¶ 3. Each Board Member has statutory responsibility under Oklahoma law for the governance and administration of TPSD, including Talihina Elementary. App. Vol. 1 at 29–30, ¶¶ 6–11; 70 O.S. § 5-117(A). Each of these Board Members was aware of, and approved, the school's sex-segregation policy. App. Vol. 1 at 32, ¶ 23. They did so specifically on the basis of stereotypes and assumptions "about boys and girls, their behavior, and the discipline and instruction permissible for or required for each." App. Vol. 1 at 32, ¶ 24.

After Plaintiffs' initial complaints went unheeded, these Board Members attended a meeting, on September 6, 2022, at which the Stepp Family and other concerned parents presented detailed information about the "ongoing policy of sex segregation," McClain's "behavior and bullying of J.S.," and J.S.'s removal from his class. App. Vol. 1 at 46, ¶ 115. So it was with direct and actual knowledge that each of these Board Members failed or refused to exercise their supervisory powers and responsibilities to rectify the many ongoing constitutional violations.

App. Vol. 1 at 46, ¶¶ 116–17. Instead, they continued to enforce the offending policies, to the detriment of J.S. and the Stepp Family. *See, e.g.*, App. Vol. 1 at 64–65, ¶ 230. In addition, Board Member Russell personally oversaw J.S.'s removal from class following the Stepp Family's Title IX complaint, calling Plaintiffs to coordinate picking up J.S.'s books. App. Vol. 1 at 43, ¶ 95. This demonstrates Russell's direct involvement in the improper removal and, at this early stage, supports a reasonable inference that the entire Board was aware and approved of the removal. *Cf. Bledsoe*, 53 F.4th at 611.

**Title IX Investigators (Blair & Bryant).** As alleged in lengthy detail in the Complaint, once Blair and Bryant replaced McLemore as Title IX Investigators, they rushed through a transparently one-sided "investigation" in order to close the file and absolve McClain. COMPL. ¶¶ 121–133 (Tellingly, McLemore resigned on a Thursday, September 8, and the investigation was closed just six weekdays later, by Saturday, September 17.) In addition, they both directly participated in retaliatory conduct following J.S.'s long-awaited return to school. On the very first day that J.S. was back in a classroom, following the OSDE-mandated reintegration, Blair forced J.S. to sit on the floor during class. App. Vol. 1 at 52–53, ¶¶ 153–55. This is despite the fact that all other students had desks and chairs *and* despite the fact that J.S. himself had a desk in that same room earlier in the day—when another educator was teaching and before Blair obtained custody of J.S. App. Vol.

1 at 53, ¶¶ 155–56. Bryant personally observed this mistreatment, but ignored J.S.'s request for a desk and allowed Blair's retaliation campaign to continue. App. Vol. 1 at 53, ¶¶ 157–58. At a school basketball game the following week, Jonathon Stepp asked Blair why J.S. had been made to sit on the ground. App. Vol. 1 at 53, ¶ 159. In response, Blair shouted physical threats and defamatory comments at the entire Stepp Family until other bystanding adults physically intervened and escorted Blair out of the gym. App. Vol. 1 at 53–54, ¶¶ 159–64. Ultimately, due to this and the above-described conduct, the Stepp Family had to reconcile with the reality that "they were not welcome at TPSD or its public functions and could not, in the future, safely report any issues or sexual harassment or bullying." App. Vol. 1 at 55, ¶ 167. They removed J.S. and his siblings from Talihina Elementary, the only public school in the immediate vicinity, and began to homeschool. App. Vol. 1 at 55, ¶¶ 168–69.

Thus, the Complaint adequately alleges the who, what, where, and how necessary to support Plaintiffs' claims. It also attaches findings of the OSDE that— at minimum—raise Plaintiffs' claims to relief "above the speculative level." *Twombly*, 550 U.S. at 555. The District Court was correct in finding the same.

**B. The District Court correctly found that Lockhart, Anderson, and the Board Members each participated in the violation of Plaintiffs' clearly established Equal Protection Rights.**

### 1. *Violative Conduct*

The District Court conducted a thorough and individualized analysis of the Stepp Family's equal protection claim against each Appellant, and correctly concluded that Lockhart, Anderson, and each of the Board Members personally participated in violating Plaintiffs' equal protection rights. Appellants attack this finding by arguing that (i) the court erred in its application of the deliberate-indifference standard and (ii) the so-called separate-but-equal treatment of male and female students precludes a discrimination claim. Dkt. 20 at 25–28.

First, the question of "deliberate indifference" is irrelevant to those instances where defendants directly, actively caused the alleged discrimination—such as when Lockhart and Anderson directed and implemented a facially discriminatory policy of sex segregation or when the Board Members knowingly endorsed that policy. Indeed, a deliberate-indifference standard makes sense only when a plaintiff alleges that a supervisor or decisionmaker who did *not* directly cause the discrimination nonetheless participated in it through knowing acquiescence—such as when TPSD Officials with actual knowledge of McClain's sexual harassment allowed it to continue unabated despite Plaintiffs' repeated requests for intervention. *See* Part I.A.2. *supra*.

Thus, where Anderson and Lockhart personally "spearheaded the implementation of TPSD's segregation policy at Talihina Elementary," and did so specifically on the basis of sex-based stereotypes and unsupported notions of the "discipline and instruction permissible for or required for [boys and girls]," App. Vol. 2 at 62, they *directly* violated Plaintiffs' equal protection rights and there was no need for the lower court to conduct a deliberate-indifference analysis. So, too, with each of the Board Members, who were statutorily responsible for the governance of the school, were aware of the segregation policy, and "either explicitly or tacitly approved of the same." App. Vol. 2 at 63.

Furthermore, the lower court *did* conduct all appropriate analyses: correctly noting that intermediate scrutiny applies, App. Vol. 2 at 54; that the policy was discriminatory in both its purpose and effect, App. Vol. 2 at 62–63; and that the Complaint's allegations show a direct causal link between the policy and the injuries J.S. suffered, *id.. See also* App. Vol. 1 at 85–86 (OSDE Ltr.) (expressing "concern[] about statements made by District educators indicating that there was in fact an intent to treat Talihina's 5th grade boys and girls differently"). Unsurprisingly, and as the District Court found, this directly resulted in the disparate treatment of J.S. on the basis of sex, including J.S. being "disciplined" [verbally abused] with inappropriate harshness and being exposed to "frank" conversations [inappropriate sexual topics] because he was a male student assigned

27

to the boys' room. *See, e.g.*, App. Vol. 1 at 32, ¶¶ 25–26. And McClain has admitted as much. In a written statement, he explained that "having the students in an all boy setting" gave him the "opportunity to instruct the students in proper behavior" for boys and allowed him to "have some frank conversations that could not take place in a boy/girl mixed setting." [4] App. Vol. 1 at 32, ¶ 25.

And the TPSD Officials *were* deliberately indifferent to McClain's ongoing sexual harassment. They ignored not only credible reports of McClain singling out J.S. for abusive treatment based on assumptions about J.S.'s sexuality and gender performance but also McClain's own admissions of his offending behavior. Despite having all authority and opportunity to end this conduct, they instead defended McClain's behavior, and when Plaintiffs complained, they involuntarily removed *J.S.*, not *McClain*, from the classroom. *See* Part I.A.2. *supra*.

Second, this Court should summarily reject Appellants' highly suspect argument that no discrimination could arise where boys and girls were separated, but that *separation* "applied *equally* to both sexes." Dkt. 20 at 28. The Supreme Court has long rejected separate-but-equal treatment of protected classes, *see Brown v. Board of Ed. of Topeka*, 347 U.S. 483, 493 (1954), and sex-segregating

---

[4] McClain also drew distinctions between J.S. and the other male students based on McClain's opinions of J.S.'s gender performance and masculinity—opining that if J.S. were a more "mature" male he might better "handle" McClain's discussions of sexual topics. App. Vol. 1 at 35, ¶ 44 & 37, ¶ 62.

an elementary school classroom is a straightforward violation of the Equal Protection Clause as guaranteed by the Fourteenth Amendment.

To evaluate an equal protection claim on the basis of sex-based classifications, courts apply intermediate scrutiny. *Doe v. Rocky Mtn. Classical Aca.*, 99 F.4th 1256, 1259–60 (10th Cir. 2024). This standard "is not a new standard, and its application is clear in both Supreme Court and Tenth Circuit precedent." *Id.* State actors violate that standard when they impose sex-based classifications without "provid[ing] a justification …that is 'exceedingly persuasive'" and that "serve[s] 'important governmental objectives' through means 'substantially related to' achieving those objectives." *Id.* at 1260 (quoting *United States v. Virginia*, 518 U.S. 515, 524 (1996); citing *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). Thus, for instance, when a school imposed a dress code that permitted female students to wear earrings but prohibited male students from the same, and it did not—in its motion to dismiss—offer a justification for this sex-based rule, the Tenth Circuit held that no court could resolve the issue in favor of the school at that stage. *Id.* at 1261 ("Until RMCA provides a justification for their sex-based classification, we cannot evaluate whether RMCA's justification is 'exceedingly persuasive'…. The only issue on this appeal is whether Plaintiff stated a plausible claim …. [W]ith respect to his § 1983 equal protection claim, Plaintiff did.").

But Appellants do not attempt to articulate *any* justification, much less an exceedingly persuasive one. Instead, they make the generic argument that K-12 schools are permitted broad authority to "structure the educational environments" and cite a single case from a district court in West Virginia for the inapposite finding that providing parents an option to *voluntarily place* their students in a single-sex classroom is not necessarily unconstitutional. Dkt. 20 at 35 (relying on *Doe v. Wood Cnty. Bd. of Ed.*, 888 F. Supp. 2d 771 (S.D.W.Va. 2012)). Setting aside the nonbinding nature of that case, its conclusion has little to do with the fact scenario before this Court: the involuntary segregation of all students by sex, without any co-educational equivalent or nondiscriminatory justification offered.

### 2. *Clearly Established Law*

Any relevant Supreme Court or Tenth Circuit decision is *alone* sufficient to clearly establish a right for purposes of qualified immunity. *A.N. v. Syling*, 928 F.3d 1191, 1197 (10th Cir. 2019). And the Supreme Court has recognized since 1982 that involuntary sex-segregation of public-school classrooms is a violation of equal protection, at least absent some "exceedingly persuasive justification." *Hogan*, 458 U.S. at 724. This straightforward pronouncement from the highest court *40 years ago* was more than enough to place TPSD Officials on fair notice that their conduct was unconstitutional. That Court's *Virginia* decision and the Tenth Circuit's longstanding recognition that sex-based harassment violates the

same constitutional provision merely provide *further* notice to Defendants that Plaintiffs' rights were clearly established. *See, e.g.*, *Virginia*, 518 U.S. at 524; *Escue v. N. Okla. College*, 450 F.3d 1146, 1157 (10th Cir. 2006); *Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989). Although further specificity was hardly necessary, the enactment of Title IX in 1972 provided exactly that. *See* 20 U.S.C. § 1681; 34 C.F.R. § 106.34(a)–(b)[5] (enacted May 19, 2020) (85 Fed. Reg. 30,026); *see also Hope*, 536 U.S. at 740–41, 743–44 (considering regulations and federal guidelines in determining that defendants had "fair warning" of the unconstitutionality of their practices).

It cannot be seriously argued that in 2022 it was unclear to reasonable, good-faith state actors that sex segregating a classroom was impermissible. But in an attempt to escape the inescapable, Appellants ask this Court to ignore the well-pleaded allegations in favor of a brand new and wholly unsupported narrative: that of an "initial, temporary, administrative" segregation, Dkt. 20 at 34, 41, in which the separate learning environments were "comparable" and fully "equal," Dkt. 20 at 28, 34. This counterfactual may not be accepted, in light of the detailed allegations showing the boys' class was subjected to materially worse treatment

---

[5] These regulations clarify that, subject to certain inapplicable exceptions, a Title IX "recipient shall not … carry out any of its education programs or activities separately on the basis of sex," and that in the limited situations where sex-segregation is permitted to meet some sort of unique and legitimate educational need, the sex-specific classes must be supplemented by an available *coeducational* alternative in the same subject. 34 C.F.R. § 106.34(a)–(b).

than the girls' class. *See, e.g.*, App. Vol. 1 at 38, ¶ 64 & 50, ¶ 140. Moreover, there is nothing to suggest the segregation was temporary, except in the sense that OSDE ultimately ordered re-integration against Appellants' will, *see* App. Vol. 1 at 50–51, ¶¶ 138–46. Even if these *were* the facts, they would still constitute a violation of clearly established law, given that Appellants' separate-but-equal argument has been roundly rejected since 1954. *See Brown*, 347 U.S. 483.

**C. The District Court correctly found that Lockhart, Anderson, and the Board Members each participated in the violation of Plaintiffs' clearly established Procedural Due Process Rights.**

### 1. *Violative Conduct*

Plaintiffs' procedural-due-process claim centers on each TPSD Officials' individual participation in (i) approving and enforcing an obviously unconstitutional policy of sex-based segregation of public-school students, despite Plaintiffs' complaints, and (ii) a constitutionally inadequate and objectively unfair handling of those complaints that culminated in the complete deprivation of J.S.'s education without notice or hearing. *See* App. Vol. 1 at 43–44 & 63–65, ¶¶ 94, 101, 217, 220, 228, 235. The District Court correctly found that Plaintiffs pleaded adequate facts in support of this claim. *See* App. Vol. 2 at 64–65.

As to the first basis—enforcement of the segregation policy—the Complaint alleges that each Appellant adopted or ratified, implemented, and enforced the separation of male and female students into separate classrooms on the sole basis

of their sex and, through their continued enforcement of this unconstitutional policy, deprived J.S. of his right to a public education. *See* App. Vol. 1 at 65, ¶ 235. For instance, due to Appellants' persistent refusal to provide integrated, coeducational classrooms in compliance with federal law, once Appellants' closed their Title IX "investigation," the only options available for J.S.'s education were to continue suffering sex- and gender-based abuse in McClain's all-boys room, to experience the discomfort and social stigma of being the only male student in the all-girls room, or to forego any meaningful educational opportunity at the free public school in his district.[6]

Regarding the second basis—the investigation and response to Plaintiffs' complaints—the Complaint alleges several relevant facts. In general, Plaintiffs allege that, in response to their official complaints regarding McClain's misconduct, *J.S.* was removed from his classroom without process. Initially, he was sent home; later, he received a "modified schedule" that included only one hour of classroom time and otherwise isolated him in the library without meaningful instruction or interaction for the entire day. *See* App. Vol. 1 at 38–44,

---

[6] That is, until OSDE ordered Appellants to rectify their clear violations of federal law by reintegrating the school. *See* App. Vol. 1 at 85–86. Unfortunately, Appellants' retaliatory conduct toward Plaintiffs following this reintegration ultimately resulted in the family withdrawing J.S. from school altogether—a constructive expulsion, in effect. *See* Part I.D. *infra*.

¶¶ 65–105. This arrangement persisted for several weeks,[7] despite Plaintiffs' repeated complaints and without any meaningful notice or opportunity to object. *See id*. The Complaint also alleges additional particularized facts directly linking Appellants to this deprivation of Plaintiffs' rights to due process.

First, Anderson, Lockhart, McClain, and others conferred upon learning of Plaintiffs' intention to file a Title IX complaint and conspired to coordinate the school's response. App. Vol. 1 at 38, ¶ 65. Lockhart and McClain met with Plaintiffs, received their complaints, and denied them requested information on relevant procedures, and Defendants Anderson and Lockhart thereafter directed various officials' conduct in response to Plaintiffs' complaints. App. Vol. 1 at 38–39, ¶¶ 66–71. Board Members (Russell, Woods, Crank, Blue, and Moreland) and Superintendent Lockhart were legally responsible for the governance and administration of TPSD, but despite full knowledge of not only the ongoing sex-segregation and sex-based harassment but also the improper removal of J.S. from his class, failed to correct the several violations of his rights. *See* App. Vol. 1 at 29–30, ¶¶ 7–11; *see also id.* at 32, ¶ 23 & 46, ¶¶ 115–17. Finally, Blair and Bryant conducted the formal investigation of Plaintiffs' complaints in violation of myriad

---

[7] Relatedly, although Appellants repeatedly emphasize that the segregation policy was only "temporary," *see* Dkt. 20 at 34–36, there is nothing in the Record to suggest that the policy was intended to be temporary. Instead, as Plaintiffs allege, the termination of that policy was a result of the Oklahoma State Department of Education mandating Appellants immediately integrate their classrooms. *See* App. Vol. 1 at 50, ¶¶ 138–42.

procedural rights owed to Plaintiffs, *see* App. Vol. 1 at 47–49, ¶¶ 120–32, and all other TPSD Officials accepted the manufactured result of this intentionally deficient investigation and knowingly relied on it to force Plaintiffs to either return J.S. to McClain's class for further abuse or remove him from public school, *see id.* at 49, ¶ 136.

## 2. *Clearly Established Law*

The District Court correctly found that Defendants Anderson Lockhart, Russell, Woods, Crank, Blue, and Moreland "chose to continue enforcing the facially unlawful segregation policy . . . over [Plaintiffs'] objections and with knowledge that J.S. was receiving deficient, if any, educational instruction," and that "immediately after" Plaintiffs filed a sexual-harassment complaint against McClain, Defendants Lockhart, Anderson, McClain, Blair, and Bryant "unilaterally removed J.S. from McClain's classroom for approximately six weeks without notice, without any type of hearing, and without providing alternative options for fair and equitable instruction." *See* App. Vol. 2 at 64–65.

Procedural due process requires that the state not deprive citizens of their property or liberty interests without first providing "constitutionally adequate" procedural "safeguards." *Zinermon v. Burch*, 494 U.S. 113, 125–26 (1990). What those safeguards entail "varies with the particular situation" but, ordinarily and at a minimum, they require notice and an opportunity to be heard. *See id.* at 127.

Students have an established "property interest in public education and a liberty interest in their reputations." *Coutoure v. Bd. of Ed. of Albuquerque Pub. Schs.*, 535 F.3d 1243, 1257 (10th Cir. 2008). The Supreme Court has held that even temporary suspensions implicate these interests. *Goss v. Lopez*, 419 U.S. 565, 581 (1975). Thus, even where a student is himself accused of misconduct, and even where the exclusion from school is for "10 days or less," that student is entitled to notice of the charges and "if he denies them, an explanation of the evidence … and an opportunity to present his side of the story." *Id.* Again, those "rudimentary precautions" aimed at preventing "mistaken findings of misconduct and arbitrary exclusion from school" are the *minimum* required process for very *brief* suspensions. *Id.*; *see also id.* at 584 (recognizing "longer suspensions . . . may require more formal procedures").

Appellants improperly contort Plaintiffs' due process claim by suggesting that J.S. is not constitutionally entitled to a particular classroom placement, instructor, or investigative outcome. *See* App. Br. at 36–37. Whether J.S. was deprived of constitutional guarantees by his initial classroom placement or by the outcome of an imitated investigation is a question that may concern Plaintiffs' *other* claims—but their procedural due process claim centers on Appellants' denial of any meaningful procedural protections owed to J.S. prior to *his* plainly disciplinary *removal* from classroom instruction. *See* App. Vol. 2 at 64–65.

To be clear, J.S.—who was not himself accused of any misconduct—was sent home from school immediately upon his Title IX complaint, without any process, and then was excluded from a normal classroom environment for more than *six weeks*, during which time pertinent evidence was withheld from Plaintiffs and at the end of which no explanations were provided. App. Vol. 1 at 49, ¶¶ 133–34; *cf. Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018) ("[T]o the extent any of the evidence contained within this report [compiled by the Title IX investigator] was used . . . to adjudicate John's claim, and John was not provided this evidence, he has alleged a cognizable due-process violation."). During that same period, J.S. was directly prohibited from participating in school sports on the pretext that his grades had, predictably, dropped when the school stopped providing him with a teacher. App. Vol. 1 at 43–44, ¶¶ 100–04. Moreover, the manner in which the investigation was conducted evidences the lack of impartial decision-makers. App. Vol. 1 at 38–44, ¶¶ 65–105. This is a failure of procedural due process on a most basic level, it was personally participated in by all Appellants both through direct interference with and the failure to intervene in a sham investigation, and it directly resulted in the unfair and arbitrary deprivation of J.S.'s property rights in his ongoing education. *See Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001).

More specifically, the sex-based segregation policy was—as the District Court found—"facially unlawful." *See* App. Vol. 2 at 65. As any reasonably

informed state actor understands, the notion that students can be provided a "separate but equal" education is constitutionally suspect. *E.g., Brown*, 347 U.S. at 493; *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful'"). While Appellants urge that the constitution tolerates exceptional cases where segregation policies are motivated by and reasonably related to an important government interest, no such identifiable interest animates the policy enforced by TPSD. *See* Dkt. 20 at 34. And, contrary to Appellants' insistence, *see* Dkt. 20 at 34–35, the Complaint *does* allege that TPSD's segregation policy was motivated solely by "offensive and outdated stereotypes about boys and girls, their behavior, and the discipline and instruction permissible for or required for each," App. Vol. 1 at 32, ¶¶ 24–27, and that it resulted in J.S. being deprived of constitutionally protected educational opportunities, *see* App. Vol. 1 at 56 & 64–65, ¶¶ 177–81, 230–36.

Plaintiffs therefore plead sufficiently that the several Appellants' maintenance and enforcement of the sex-segregation policy was in violation of clearly established law. Again, the Supreme Court has recognized since 1982 that involuntary sex-segregation of public-school classrooms is unconstitutional absent

some "exceedingly persuasive justification."[8] *Hogan*, 458 U.S. at 724. Likewise, Plaintiffs plead sufficiently that the several Appellants' participation in the denial of any procedural protections prior to J.S.'s removal from the classroom was in violation of clearly established law—the Supreme Court established in 1975 that a student could not be excluded from school, even for fewer than ten days, without minimum process including receipt of the pertinent evidence and an opportunity to respond. *Goss*, 419 U.S. at 581; *see also Coutoure*, 535 F.3d 1243. Those authorities—and their progeny—"squarely govern" the specific conduct of these Appellants. *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019); *see also Hope*, 536 U.S. at 745 (precise factual analog unnecessary where conduct is obviously unconstitutional); *Bledsoe*, 53 F.4th at 617 (noting plaintiff may argue that constitutional obligation should be obvious to reasonable state actor); *Thompson*, 23 F.4th at 1255 ("[A] general constitutional rule . . . may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful").

---

[8] The obviousness of the policy's constitutional infirmity is further evidenced by OSDE's prompt response to learning of it—that Department quickly ordered TPSD to take "immediate corrective action" because "providing public school students different educational environments based on sex violates federal civil rights laws." App. Vol. 1 at 85–86 (Compl. Ex. 1). The Department's demand letter included guidance provided by the U.S. Department of Education in 2014 that details the limited circumstances in which separation of students by sex may be permitted, noting that "these authorized circumstances cannot apply to the separation of an entire grade level." *Id*.

On the other hand, the authorities cited by Appellants are easily distinguished. First, in *Doe v. Gooden*, the Eighth Circuit found that certain school administrators were not liable for a teacher's behavior because they *lacked notice* of a sufficiently grave pattern of misconduct. *See*, 214 F.3d 952, 956 (8th Cir. 2000). The Eighth Circuit nevertheless recognized that "[s]chool district officials can be liable under § 1983" where they "received notice of a pattern of unconstitutional acts, demonstrated deliberate indifference to the acts, failed to take sufficient remedial action," and "such failure proximately caused the injury to the students." *Id*. at 955. Plaintiffs allege just that—and the District Court correctly found that, after being notified of Plaintiffs' complaints, "[r]ather than provide the process owed" to J.S., "Anderson and the Board Members chose to continue enforcing the facially unlawful segregation policy" and J.S. consequently received "deficient" education. App. Vol. 2 at 65.

Similarly, this Court's decision in *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504 (10th Cir. 1998), lends no support to Appellants' argument that the Constitution tolerates their manipulative handling of the investigation and response to Plaintiffs' complaint. In *Tonkovich*, the Court applied qualified immunity to a procedural-due-process claim where, *prior* to termination of employment, the plaintiff (who was a teacher accused of *perpetrating* sexual harassment on students and not, as J.S., a student victimized by such harassment) received

"notice, an explanation of the charges against him, and an opportunity to respond," including a "full-blown evidentiary hearing," as well as "various post-termination proceedings." *Id*. at 526. Still, the Court reiterated the "fundamental principle of due process," including the right to "a hearing before an impartial tribunal" that is not "biased with respect to the factual issues to be decided at the hearing." *Id*. at 518. Here, J.S.—himself accused of no wrongdoing—was provided no notice at all, no hearing at all, and all involved parties were demonstrably biased as to the relevant factual issues. *See* App. Vol. 1 at 38–49, ¶¶ 65–132. The Court should affirm the denial of qualified immunity on this claim.

### D. The District Court properly determined that the TPSD Officials' First Amendment retaliation would chill persons of ordinary firmness.

As to the First Amendment Retaliation claim, Appellants do not dispute that Plaintiffs were engaged in protected activity, that Appellants acted with retaliatory motives, or that it was clearly established that this type of retaliation was prohibited.[9] *See* Dkt. 20 at 24, 39–40. Instead, as they did below, Appellants argue only that their retaliatory conduct was insufficient, as a matter of law, to chill the conduct of a person of ordinary firmness. App. Vol. 1 at 177–78; Dkt. 20 at 24, 40.

---

[9] For cases showing that Plaintiffs' First Amendment rights were clearly established, *see* App. Vol. 1 at 258–59.

In fact, Appellants do not dedicate any meaningful argument to this issue on appeal. Instead, they make only conclusory statements that Anderson's unlawful public disclosure of Plaintiffs' identities (as Title IX complainants) and Blair's verbal threats of violence at a school-sponsored basketball game were "isolated verbal encounters, not actions that would chill a person of ordinary firmness under *Shero v. City of Grove*, 510 F.3d 1196 (10th Cir. 2007)." Dkt. 20 at 24.

But *Shero* is inapposite and does not address, much less decide, the question of whether "verbal encounters" are legally insufficient to chill. In *Shero*, the plaintiff complained that city officials had retaliated against him by denying his request for copies of council documents (and filing a declaratory judgment suit to determine whether these documents were open records) and by imposing a three-minute time limit on his remarks during a council meeting. 510 F.3d at 1203–04. This Court held that the standard for evaluating "chill" is objective rather than subjective and that Mr. Shero's de minimis or "trivial" injuries would not support a retaliation claim. *Id.* Of course, the council's right of resort to the courts was co-equal to Mr. Shero's right to free speech, and the Court observed that being "properly named … in a declaratory judgment suit" is no injury at all—particularly where the nature of the suit was merely to determine the council's rights and duties and where a damage award against Mr. Shero was not even available. *Id.* As to the time limit on public comment, the Court held that it represented an appropriate

restriction "designed to promote orderly and efficient meetings" and that any injury was de minimis because Mr. Shero was still able to—and, in fact, did—publicly express his opinions and criticisms. *Id.*[10]

This unremarkable conclusion hardly vindicates Appellants. Principal Anderson not only outed Plaintiffs as Title IX complainants in direct contravention of then-applicable federal regulation, 34 C.F.R. 106.71(a) (2020), but she also intentionally spread falsehoods aimed at discrediting and further ostracizing the Stepp Family in their community. *See* App. Vol. 2 at 41; *see also* App. Vol. 1 at 52, ¶¶ 147–52.[11] And Blair's "verbal encounter" was accurately summarized by the lower court as "public, defamatory, profanity-laced tirade" that crescendoed into threats of physical violence. App. Vol. 2 at 41. These malicious verbal attacks are nothing like the *Shero* defendants' good-faith attempts at orderly, civil proceedings. *See Irizarry v. Yehia*, 38 F.4th 1282, 1292 (10th Cir. 2022) (recognizing that "[p]hysical and verbal intimidation can chill speech").

---

[10] Appellants' one other citation, to *McBeth v. Himes*, 598 F.3d 708 (10th Cir. 2010), offers no additional aid. Appellants cite this case for the proposition that "verbal insults, even crude or offensive ones, are insufficient to chill protected activity" and that "verbal criticism by officials [is] not materially adverse." Dkt. 20 at 40. But *McBeth*, which explores the causation issues that arise in retaliatory prosecution cases, nowhere discusses material adversity, verbal criticism *by* officials, or objective chill.

[11] Anderson told other parents, for example, that the reason for midyear classroom changes was Plaintiffs and their supposedly unsubstantiated allegations against McClain—failing to mention that OSDE had ordered the classrooms desegregated not because of Plaintiffs' *true* and *admitted* allegations but because the school's sex-segregated classrooms violated civil rights laws. App. Vol. 1 at 52, ¶ 147; *see also id.* at 85–86.

Moreover, the TPSD Officials' conduct went far beyond these so-called "verbal encounters." As described in Part I.A.2., *supra*, and in the Complaint, they also removed J.S. from his classroom, first sending him home and later to the library; removed J.S. from his basketball team on a pretextual basis; conducted a sham investigation, at the end of which Defendants attempted to force J.S. to either leave school or return to McClain's abusive environment; and embarrassed and punished J.S. upon his return to school by making him sit on the floor while all of his peers sat in chairs. *See, e.g.*, App. Vol. 1 at 43–46, ¶¶ 103–04, 109, 111–13, 115–17; *id.* at 48–49, ¶¶ 131–35; *id.* at 52–53, ¶¶ 154–58. All of this was done in response to the Stepp Family's Title IX complaint, OSDE complaint, and speech at the September 2022 TPSD Board Meeting. The Complaint also points to frequent communication between Anderson, Lockhart, Russell, and the other Board Members regarding J.S., his complaint, and the school's response. *See* App. Vol. 1 at 38, ¶ 65; *id.* at 45–46, ¶¶ 109, 111–13, 115–17. This supports a reasonable inference that in addition to their direct and active retaliation, all TPSD Officials knew of and acquiesced in the ongoing retaliation of others.

Whether a person's exercise of constitutional freedoms would be chilled under the circumstances is a context-dependent question. *Cf. Johnson v. Whitney*, 723 F. App'x 587, 594–95 (10th Cir. 2018) And so is the meaning of "de minimis" injury. *Id.* (holding where inmate made approximately $7 per month and used

funds to purchase necessities, withholding $1.41 from his pay could be sufficiently chilling and was neither de minumus nor trivial). Any one of the TPSD Officials' acts would be enough to chill a person of ordinary firmness, especially when that person is a young child *or* a parent seeking to protect and educate their young child. The *collective* force of the TPSD Officials' many retaliatory acts—which imperiled a young child's sense of self and sexuality, social network, education, and formative views of justice—would surely overwhelm even the most stalwart. And, indeed, TPSD Officials succeeded in forcing Plaintiffs to withdraw J.S. and his siblings from TPSD altogether. App. Vol. 1 at 55, ¶¶ 167–70.

This withdrawal, after weeks of adverse action, itself indicates the "chilling effect" of Appellants' conduct. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) ("[Pl]aintiff's actual response to the retaliatory conduct provides [nondispositive] evidence of the tendency of that conduct to chill First Amendment activity."). On these facts, a jury "could conclude that the retaliatory conduct was sufficient to deter a person of ordinary firmness." *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000); *see McCook v. Spriner Sch. Dist.*, 44 F. App'x 896, 903–05 (10th Cir. 2002) (finding plaintiffs could prevail on "chill" element where child was forced to move and attend school out of state after defendants suspended him in response to litigation). The lower court did not err in finding the Section 1983 retaliation claims should proceed.

**E. TPSD Officials are not immune from suit on the foregoing violations, and they are not immune from their conspiracy to commit said violations.**

As to Plaintiffs' Section 1983 conspiracy claim, Appellants make a single argument: that the District Court "failed to conduct any qualified immunity analysis[.]" Dkt. 20 at 41. This ignores that court's detailed treatment of each individual defendant's alleged role in a conspiracy to deprive J.S. of constitutional rights. *See* App. Vol. 2 at 70–73. As the court correctly observed, Plaintiffs allege Anderson "personally participated in" and "perhaps engendered" the conspiracy, and furthered it by withholding evidence and exposing and discrediting Plaintiffs. App. Vol. 2 at 70–71. They allege Lockhart was an original member of the conspiracy and furthered it by undermining the original Title IX Investigator (who ultimately resigned in protest) and ignoring Plaintiffs' complaints while refusing obviously necessary remedial action. App. Vol. 2 at 71. They allege Russell was also an original member of the conspiracy and furthered it by ignoring Plaintiffs' complaints and refusing remedial action. App. Vol. 2 at 71–72. They allege Blue, Crank, Moreland, and Woods also joined the conspiracy when informed of Plaintiffs' complaint and furthered it by installing Blair and Bryant to conduct a sham investigation. App. Vol. 2 at 72.

The District Court correctly found that these allegations are sufficient at the pleading stage to state a claim for conspiracy to violate Plaintiffs' equal protection

and procedural due process rights. App. Vol. 2 at 70–73. At that stage, a plaintiff need only allege facts showing "an agreement upon a common, unconstitutional goal" and "concerted action" in furtherance of that goal. *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021). Because "direct evidence of an agreement to join a conspiracy is rare," a co-conspirator's "assent can be inferred from acts furthering the conspiracy's purpose." *Bledsoe*, 53 F.4th at 609. Consequently, an express agreement is unnecessary. *See Frasier v. Evans*, 992 F.3d 1003, 1024-05 (10th Cir. 2021).

And through its several pages of individualized fact analysis, the District Court found that Plaintiffs' detailed allegations defeat Appellants' qualified-immunity defense as to all but Blair and Bryant. Appellants do not meaningfully contest the court's determinations but seem to suggest that because the opinion does not more explicitly treat the "clearly established" prong of the immunity analysis, this Court should reject these well-reasoned conclusions. To the contrary, this Court recognized the availability a Section 1983 conspiracy claim ("that is, a conspiracy to deprive a plaintiff of a constitutional or federally protected right under color or state law") as early as 1990. *Bledsoe*, 53 F.4th at 609 (citing *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990).

And as to the offending goals *underlying* Appellants' conspiracy, whether their constitutionality had been clearly established is a question already separately

answered in the lower court's thorough analyses of Plaintiffs' equal protection and due process claims. *See* App. Vol. 2 at 70–73 (referencing prior findings on other counts); *see also, e.g.*, *id.* at 59, 64 (citing *Coutoure*, 545 F.3d at 1256; *Goss*, 419 U.S. at 574 to find it "well-settled" that students have property and liberty interests and attendant procedural due process protections in educational contexts); App. Vol. 2 at 66 (finding Appellants' segregation policy "facially unlawful"). The analysis here is no different: where it is clearly established that a state actor may not individually engage in behavior, he or she cannot be immunized from conspiring to jointly commit the same unlawful acts.

## II. APPEAL 25-7039 (TEACHER KEVIN MCCLAIN)

### A. McClain personally participated in the deprivation of Plaintiffs' Equal Protection and Substantive Due Process Rights.

McClain, for his part, engaged in a sustained campaign of fear, hatred, and bigotry aimed at breaking the spirit, ruining the reputation, and stunting the sexual and social development of an eleven-year-old child. J.S. was only in McClain's class for ten school days before his parents made a formal complaint and TPSD Officials removed J.S from the classroom. In those very first ten days of the school year, McClain made J.S. cry in class twice, started at least two inappropriately sexual conversations (about kissing and about male genitalia), called J.S. two different sex-based slurs, affirmatively encouraged J.S.'s classmates to engage in sex-based harassment of J.S., and screamed at J.S.'s class so many times and so

violently that J.S. "repeatedly" reported the behavior to his parents and at least two concerned parents of other children called Plaintiffs to report the behavior. App. Vol. 1 at 33–37, ¶¶ 34–45, 55–59. Persistently, even if briefly, McClain used his position of authority, as well as his physical position as the only adult in a room full of children, to isolate, intimidate, and harm J.S. through a variety of tactics, each more disgusting than the last. He told J.S.'s peers that J.S.'s attempts to horseplay in the ordinary manner of elementary school children was sexual and freakish. App. Vol. 1 at 35, ¶¶ 45–46. He told J.S.'s classmates (based on nothing more than his own assumptions) that J.S. was not only homosexual but also perverse—instructing them not to draw penises in their notebooks, *not* because that is inappropriate behavior for a classroom but rather because J.S. is "queer" and incapable of handling that sort of thing. *See* App. Vol. 1 at 35, ¶ 44 & 37, ¶ 62. He instructed J.S.'s classmates to join him in calling J.S. a "f**." App. Vol. 1 at 35, ¶¶ 45–46. He screamed, berated, and belittled until J.S. cried in front of all of his male counterparts on more than one occasion. App. Vol. 1 at 33–34, ¶¶ 37–38. And then he blamed J.S.'s lack of masculinity—or male "maturity"—for J.S.'s sensitivity to the mistreatment. App. Vol. 1 at 37, ¶ 62.

**B. The District Court correctly found that McClain directly violated Plaintiffs' clearly established rights to Equal Protection under the law.**

### 1. *Violative Conduct*

Sexual harassment by a state actor violates the Constitution's promise of equal protection. *Rost v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1124 (10th Cir. 2008) (citing *Starrett*, 876 F.2d at 814. And McClain's behavior satisfies all elements of such a claim:[12] that (i) defendant's conduct subjected plaintiff to sex-based discrimination, and that conduct (ii) was unwelcome and (iii) sufficiently severe or pervasive to create a "hostile or abusive educational environment." *Escue*, 450 F.3d at 1157. Confronted with the gross reality of his behavior, McClain argues only that the Stepp Family has not shown his behavior was unwelcome. *See* Dkt. 20 at 48–50 (ignoring the first element and expressly acknowledging that Plaintiffs' allegations satisfy the "severe and pervasive" element).

More specifically, McClain asks this Court to borrow Title VII precedent, involving adults voluntarily participating in the workplace, to hold that because his

---

[12] McClain incorrectly states that Plaintiffs have disclaimed a "class of one" theory. Plaintiffs, indeed, proceed primarily on a traditional claim. But they also argued in the alternative below, pointing out that "[e]ven if J.S. were proceeding as a class of one, he could satisfy that standard" because the facts "more than support McClain's animosity and ill will toward J.S. in ways and for reasons that have nothing at all to do with McClain's legitimate state activity." Still, as Plaintiffs previously argued, "given that McClain has already admitted his disparate treatment was sex-based, Dkt. 93 at ¶¶ 25, 46, 61–62 [App. Vol. 1 at 32, 35, 37], Plaintiffs do not have to satisfy any unique standards." App. Vol. 1 at 268.

child victim lacked a perfect understanding of the slurs used against him, this child had somehow *welcomed* McClain's inappropriate conduct. Dkt. 20 at 49. That astonishing argument ignores not only common sense and basic understandings of reality, but also the detailed allegations of J.S. breaking into tears multiple times in class due to his subjective experience of McClain's hostility, of J.S.'s parents complaining about McClain's abusive behavior before they even knew the full, slur-filled extent of it, and of the subjective fear and basic comprehension that led J.S. to ask his father about the words McClain had used against him. App. Vol. 1 at 33–36, ¶¶ 37–38, 49–54. McClain cannot argue with a straight face that simply because eleven-year-old J.S. had not previously been exposed to words like "f**" and "queer" he did not subjectively perceive his environment to be hostile or understand that McClain's conduct (which also included more readily understood references to genitals and kissing) was sex- or gender-related. Nor can he deny that J.S. *learning* the precise meaning while confiding in his dad about McClain's behavior was simply a natural and probable consequence of McClain's harassment and, if anything, an additional source of damage. The lower court correctly found that McClain is alleged to have violated Plaintiffs' Equal Protection rights.

## 2. *Clearly Established Law*

It was clearly established in 2022 that teacher-on-student sexual harassment is an equal protection violation. *See Doe v. Hutchinson*, 728 F. App'x 829, 834–35

(10th Cir. 2018) (collecting cases, including several published Tenth Circuit cases, to conclude that the law was clearly established prior to offending conduct in 2014). Notably, the *Hutchinson* decision is one that Appellants themselves consider a close factual analog to this case. Dkt. 20 at 48.

Despite acknowledging that *Hutchinson* leaves him unable to even colorably argue his behavior was insufficiently severe or pervasive, McClain still asks this Court to hold that the many cases *Hutchinson* relied on somehow left the law just murky enough that he should be immune from consequences. Dkt. 20 at 50. He does so based on this case's "unusual facts." Dkt. 20 at 50–51. This characterization sanitizes McClain's role in personally creating these egregious facts and suggests that because McClain so out-paced widely understood notions of legality and decency the Court should find the precedential cases of teacher sex harassment do not compare.

The Court should reject this argument, not least because the precedential cases *are* sufficiently comparable. *Hutchinson* involved a teacher making a mixture of sexual and non-sexual bullying comments in contexts that both singled out a particular female student and incorporated broad harassment of female students generally. *Id.* at 830-31. As with J.S., the student in *Hutchinson* was discouraged from participating in school activities and ostracized from peers, with the ultimate result that she "voluntarily" withdrew from school after the harassment continued

despite her complaints. *Id.* This Court conducted a thorough analysis to affirm the denial of qualified immunity on the student's equal protection claim, observing that, as early as 2003, *Sh.A. ex rel J.A. v. Tucumcari Mun. Schs.*, 321 F.3d 1285, 1289 (10th Cir.) had clearly established that "sexual harassment which gives rise to a violation of equal protection in the employment context will also do so in the teacher-on-student context" and that *many* published employment cases from the circuit clearly established *Hutchinson*'s conduct was impermissible. 728 F. App'x at 834–35. The lower court's similar conclusion here was correct, and this Court should affirm.

### C. The District Court correctly found that McClain directly violated Plaintiffs' clearly established Substantive Due Process rights.

Whether a state actor's conduct represents an invasion of substantive due process "depends on several 'non-exhaustive factors,'" including whether (i) the "harm results from misconduct by a government official," (ii) the official holds "authority over the victim," (iii) the official abuses their authority, (iv) the "misconduct exceeds run-of-the-mill negligent conduct, and is intentional or reckless," and (iv) the resulting injury "is so egregious or outrageous that it shocks the conscience." *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 749–50 (10th Cir. 2013). There is no one measure "for assessing whether conduct is conscience shocking"; instead, that "depends on the circumstances of each case." *Id.* For example, this Court has held that a "rather mild slap" to a student was

improper, but not conscience-shocking. *Muskrat v. Deer Creek Pub. Schs.*, 715 F.3d 775, 787 (10th Cir. 2013). So, too, with a four-minute timeout. *Id.*

But that is not what Plaintiffs allege. The allegations—as described above in detail—are of a fully grown man, left alone and in charge of a room full of pre-pubescent boys, using his authority and sequestered environment to target a child with sexual slurs, instruct classmates to bully him using the same slurs, physically and verbally intimidate him to the point of tears in front of his peers, invite public speculation and criticism of his nascent sexuality, encourage classmates to engage in ostracizing conduct, and obstruct his attempts to contact his parents when, in the midst of this abusive environment, the child began to feel unwell. *See, e.g.*, App. Vol. 1 at 33–35, ¶¶ 34–39, 44–47; *id.* at 75, ¶¶ 303–06.

This Circuit has recognized that psychological harm/psychological abuse alone can violate substantive due process, and that "matters relating to marriage, family, procreation, and the right to bodily integrity" are generally considered to implicate substantive due process rights. *Abeyta v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1257 (10th Cir. 1996). Of course, the incursion into those rights must be sufficiently severe, *id.*, such that a teacher calling a child a "prostitute" in class did not give rise to a claim, whereas a teacher who encouraged a special-education student's classmates to say they would "kill [him]" and to throw paper at him *did* state a substantive due process claim. *Id.*

Thus, the lower court—after correctly reciting and summarizing applicable law—determined that McClain's behavior was "arbitrary and conscious shocking" psychological abuse that attained the "high level of outrageousness" required for a substantive due process claim. App. Vol. 2 at 18–19. McClain's behavior was an "inhumane abuse of official power" that contravened "established principles of private right and distributive justice." *See id.* (citing *Abeyta*, 77 F.3d at 1254–55; *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008)). Consequently, the court found that, at this early motion-to-dismiss stage, Plaintiffs allegations are sufficient under clearly established law to defeat qualified immunity and proceed to discovery.[13] And, indeed, qualified immunity was never intended to shield "plain[] incompetence or those who knowingly violate the law." *See Mullenix*, 577 U.S. at 12. Because it would, at the time, have been perfectly clear to any reasonable state official acting in good faith that McClain's conduct was impermissible, *see Saucier v. Katz*, 533 U.S. 194, 202 (2001), the lower court's decision should be affirmed. *See also Hope*, 536 U.S. at 745 (addressing obviously unconstitutional conduct); *Bledsoe*, 53 F.4th at 617 (same).

---

[13] Crucially, *Abeyta* was decided at the *summary-judgment* stage, on review of a developed evidentiary record. 77 F.3d at 1258. The same is true of every authority cited by McClain in which a court found insufficient factual support for a substantive due process claim. *See, e.g.*, *L. H. v. Pittston Area Sch. Dist.*, 666 F. App'x 213, 217 (3d Cir. 2016); *Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 178 (3d Cir. 2016); *Costello v. Mitchell Pub. Sch. Dist. 79*, 266 F.3d 916, 921 (8th Cir. 2001); *Gooden*, 214 F.3d at 955; *Doe v. Detroit Pub. Sch. Comm. Dist.*, 2022 WL 989331, at *7 (E.D. Mich., Mar. 31, 2022); *Totty v. Indep. Sch. Dist. No. I-009 of Blaine Cnty.. Okla.*, 2010 WL 11606954, at *8 (W.D. Okla., Apr. 14, 2010).

## CONCLUSION

For the foregoing reasons, the Court should affirm the decision below.

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully request oral argument and believe it would be of material assistance to the Court in fully considering the issues presented herein.

Respectfully Submitted,

*s/Kelsey Frobisher Schremmer*
J. Blake Johnson, OBA No. 32433
Kelsey Frobisher Schremmer, OBA No. 35841
OVERMAN LEGAL GROUP, PLLC
809 NW 36th Street
Oklahoma City, Oklahoma 73118
Telephone:   (405) 605-6718
Facsimile:   (405) 605-6719
Email: blakejohnson@overmanlegal.com
            kelseyschremmer@overmanlegal.com

*- and -*

Wyatt McGuire, OBA No. 34720
McGuire Law Firm
200 E. 10th Street Plaza
Edmond, Oklahoma 73034
Telephone:   (405) 513-5658
Email:  wyatt@kentmcguirelaw.com

ATTORNEYS FOR PLAINTIFFS/APPELLEES

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,359 words, excluding those items listed under Federal Rule of Appellate Procedure 32(f) and 10th Circuit Rule 32(B). This brief also complies with the typeface and style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6), because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

*s/Kelsey Frobisher Schremmer*
Kelsey Frobisher Schremmer, OBA No. 35841

## CERTIFICATE OF SERVICE

This is to certify that on August 22, 2025, I electronically transmitted the foregoing document to the Clerk of the Court using ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

> Frederick J. Hegenbart
> Adam S. Breipohl
> Rhiannon K. Thoreson
> ***Attorneys for Appellants Lockhart, Russell, Woods, Crank, Blue, Moreland, Anderson, Blain & Bryant***
>
> Whitney M. Eschenheimer
> Jason L. Callaway
> ***Attorneys for Appellant McClain***

*s/Kelsey Frobisher Schremmer*
Kelsey Frobisher Schremmer, OBA No. 35841
